UNITED STATES NAT. BANK OF OWENSBORO, KY., *v.* LEFLORE GROCER CO.*

(Division B. May 16, 1927.)

[112 So. 700. No. 26469.]

1. PRINCIPAL AND AGENT. *Third person, contracting with undisclosed agent, may avail himself of defense existing against undisclosed agent at time principal demands fullfillment of contract.*

   Where a third person enters into a contract with an undisclosed agent, believing him to be the real principal, the agent assuming to act as principal, and third person is sued on contract by the real principal, he may avail himself of any defense which exists in his favor against undisclosed agent at time principal first demanded fulfillment of contract.

2. PRINCIPAL AND AGENT. *Third person contracting with undisclosed agent may, in action on claim by principal, set off debt or claim due from agent personally.*

   A third person, contracting with an undisclosed agent, without notice to such third person of his agency, may set off a debt or claim due to him from such agent personally in an action on contract by the principal.

3. PRINCIPAL AND AGENT. *Purchaser, in good faith of goods from undisclosed agent of undisclosed principal, has right of set-off in action by principal.*

   If a sale of goods is made by person intrusted therewith as his own, in his own name as principal, and purchaser deals with seller in good faith as principal, and it turns out that seller was an undisclosed agent of undisclosed principal, purchaser has right of set-off in action against him by such undisclosed principal.

4. PRINCIPAL AND AGENT. *Evidence held to establish that purchaser had no knowledge that holder of draft attached to bill of lading had interest in proceeds.*

   In action by holder of draft attached to negotiable bill of lading to recover proceeds of sale from purchaser after its release as an open shipment, evidence *held* to establish that purchaser had no knowledge that holder of draft had any interest in proceeds of sale.

5. Principal and Agent.   *Purchaser, with no knowledge that bank held draft attached to bill of lading, may set off claim against seller, after release as open shipment (federal Bills of Lading Act [U. S. Comp. St. sections 8604aaa-8604w]).*

, Where purchaser of stock feed had no knowledge that bank was owner of draft attached to negotiable bill of lading under federal Bills of Lading Act (U. S. Comp. St., sections 8604aaa-8604w) it had right, after release of shipment by seller as open shipment, to set off its claim against seller in bank's action on draft as fully as it would have had against seller in suit by it.

*Corpus Juris-Cyc References: Agency, 2CJ, p. 877, n. 51, 52; p. 953, n. 67.  As to right of defendant in action by undisclosed principal .on the contract made by the agent to avail himself of defenses that would have been available in an action by the agent in his own right on the contract, see annotation in 28 L. R. A. (N. S.) 227; L. R. A. 1916A, 1213; 21 R. C. L. 901; 5 R. C. L. Supp. 1178.

Appeal from circuit court of Leflore county.
Hon. S. F. Davis, Judge.
Action by the United States National Bank of Owensboro, Ky., against the Leflore Grocer Company. Judgment for defendant, and plaintiff appeals. Affirmed.

*Alfred Stoner, Floyd J. Laswell,* and *Donald S. Wright,* for appellant.

The plaintiff was indisputably a *bona-fide* purchaser of the draft.  Our court has recently held, following the majority rule, that a bank is conclusively proved to have purchased a draft outright where it credits the drawer with the amount of the draft and before notice of any infirmity in the draft allows him to withdraw an amount equal to the credit plus the amount on deposit at the time of the allowance of the credit.  *Branham et al* v. *Drew Grocery Co.* (Miss.), 111 So. 155.

The undisputed proof shows that the draft was deposited to the credit of the Owensboro Products Company on May 10, and at that time was sold to the bank.  More than the amount on deposit at the time of the deposit of the draft was withdrawn by the Products Company be-

fore the notice was received by the bank that the feed was damaged, thus conclusively proving that the bank was a *bona-fide* holder of the draft, as held in *Branham* v. *Drew Grocery Co., supra.* For another case directly in point, see *Colonial Lbr. Co.* v. *Andelusia Nat'l Bank,* 138 Miss. 566, 103 So. 343.

The bank being a *bona-fide* holder of the draft and being a holder in due course, the consignee of the feed has no right to set off as against the bank an indebtedness due the consignee. It is settled in this state that this cannot be done. *Exchange Nat'l Bank of Little Rock* v. *Russell,* 81 Miss. 169, 32 So. 314. See, also, *Bank of Gulfport* v. *Smith,* 132 Miss. 63, 95 So. 785; and *Bank of Tchula* v. *Commercial Company* (Miss.), 95 So. 742.

*Osborn & Witty,* for appellee.

If the draft and bill of lading had not been withdrawn and the bill of lading surrendered and the shipment changed from a shipper's order notify or bill of lading attached to an open shipment, we would have no standing in court. All the cases appellant has cited then would be absolutely in point and decisive.

We concede that appellant bank would have been an innocent purchaser for value and would have been protected by the federal bill of lading act if the bill of lading had not been surrendered, the draft withdrawn, and the feed delivered as an open shipment. The trouble with appellant's argument is that the bank account, the bill of lading and the draft have nothing whatever to do with their transaction.

Our contention is that this case is governed by well-settled principles of law in respect to principal and agent, and especially the law with reference to undisclosed agency.

We contend that when it is conceded, as it must be, from the undisputed evidence that appellee never had any actual notice of the transfer of the draft or bill of

lading to appellant and that the products company dealt at all times with appellee as a principal and not as an agent, it must necessarily follow that appellee having no notice of the undisclosed agency had a right to deal with the products company as a principal. We say further that whatever rights appellant had by virtue of the transfer and delivery to it of the bill of lading and draft were entirely eliminated and dissipated when the draft was withdrawn, the bill of lading surrendered, and the shipment delivered as an open shipment; and conceding appellant to be an undisclosed principal, it is nevertheless bound by the acts of its undisclosed agent.

Appellee had a right to assume and did assume that it was dealing with the products company direct; that is to say, as principal and not as agent. It is elemental law that until the debtor receives notice of the assignment or has knowledge of the facts concerning the same, he may deal with the assignor as if no assignment had been made.

It is also hornbook law that "where a third person who has entered into a contract with an agent in ignorance of the fact that he was not the real principal, as he assumed to be, if sued upon the contract by the principal, he may avail himself of every defense which existed in his favor against the agent at the time the principal first demanded fulfillment of the contract." 2 C. J. 877.

It is also well settled that "A person contracting with an agent in his own name, without notice of the agency, may set off a debt or claim due to him from the agent personally in an action by the principle on the contract." 2 C. J. 877.

And we think it has always been conceded that in asserting a set-off, the third party is not confined merely to claims which arise out of the particular contract in question. 2 C. J. at 878. See also 31 Cyc., page 1601. For a Mississippi case in point involving the same principle, see *Parker* v. *Dantzler Foundry, etc.*, 118 Miss. 126, 79 So. 82. Also 69 A. S. R. 799; 115 A. S. R. 33; 28

L. R. A. (N. S.) 228-30; 55 A. S. R, page 921, note. *Foreign Trade Banking Corp* v. *Gereseta Corp.,* decided by the New York Court of Appeals on December 27, 1923, and reported in 142 N. E. 607, is absolutely conclusive.

Argued orally by *Alfred Stoner,* for appellant, and *S. I. Osborn,* for appellee.

Anderson, J., delivered the opinion of the court.

Appellant, United States National Bank of Owensboro, Ky., brought this action in the circuit court of Leflore county against appellee, Leflore Grocer Company, to recover of the latter the proceeds of the sale of a carload of stock feed sold and shipped by the Owensboro Products Company, the draft for the purchase price of which, with bill of lading attached, appellant held when the carload of feed stuff arrived at Greenwood, in this state. Appellee pleaded as set-off against the claim of appellant a larger claim it had against the Owensboro Products Company. The trial court directed a verdict and judgment in favor of appellee, from which judgment appellant prosecutes this appeal.

There was no dispute as to the material facts of the case. Therefore either appellant or appellee was entitled to a directed verdict.

Appellee was engaged in the wholesale grocery business in the city of Greenwood in this state. The Owensboro Products Company was engaged in the manufacture of feed stuffs at Owensboro, Ky., selling such feed stuffs at wholesale. Appellant was engaged in the banking business at Owensboro, Ky. Its president, Franks, was vice president and director of the products company, and the later was largely financed by appellant. Swayne Sales Company of Memphis, Tenn., was a brokerage concern, and, when the transaction out of which this litigation arose took place, was a broker for the products company.

Appellee entered into a contract with the products company through Swayne Sales Company, as broker, for the purchase of one thousand tons of stock feed, to be shipped out as ordered by appellee, all to be shipped not later than June 1, 1920. On this contract the products company shipped only four carloads of feed, aggregating one hundred thirty tons. The products company failed and refused to ship to appellee the balance of eight hundred and seventy-five tons of feed stuff; thereby breaching its contract with appellee. The car of feed in question, containing six hundred sacks, was the last car of four carloads shipped by the products company to appellee. This shipment was made May 8, 1920. For the price of this car the products company drew a sight draft with bill of lading attached on appellee. It was a shipper's order, notify shipment. The draft for the price of the car was drawn by the products company, payable to its order, on appellee. The bill of lading attached to the draft was a negotiable bill of lading, under the federal Bills of Lading Act (U. S. Comp. St., sections 8604aaa-8604w), and the draft and bill of lading were by the products company, on May 10, 1920, assigned to appellant for value. The draft and bill of lading were forwarded by appellant in due course to a bank at Greenwood. Neither the draft nor the bill of lading were ever presented or delivered to the appellee by the bank at Greenwood. Appellee only knew, by a telephone conversation with the bank, that the latter had the draft, with bill of lading attached, for collection. Appellee did not know, at that time, nor at any other time, until shortly before this action was brought, that appellant had title to, or claimed any interest in, the car of feed, or in the draft and bill of lading.

The car of feed stuff reached Greenwood on May 27 1920, and on the same day, after having examined the contents of the car, appellee wired the products company that the car had arrived, and the feed stuff was heated and damaged, and, on the day following, appellee wrote

the products company in detail, to the effect that the feed stuff was in bad condition; that appellee was forced to refuse the shipment. Appellee, however, offered to handle the shipment for the products company, selling the feed stuff for the best price possible, and suggesting that the products company instruct the Greenwood bank to deliver up the bill of lading and draft without being paid. On May 22, 1920, the products company telegraphed appellee that they could not recall the draft and bill of lading, and requesting that appellee take up the draft and sell the car of feed stuff to the best advantage, and bill the products company for any difference. Appellee wrote the products company, declining to handle the car in that manner, and suggesting that the car be delivered as an open shipment, and appellee would sell the damaged feed to the best advantage. On May 25th the products company again wrote appellee that it was unable to release the draft, and requesting "Wire us best offer you can make." On the same day appellee replied by wire, stating that it would not make an offer; that the feed stuff might be used as hog feed; and that appellee would sell to the best advantage for the products company's account. On May 22, 1920, the products company telegraphed appellee that it had instructed the railroad company at Owensboro to wire release of the car, and asking appellee to sell the carload at once to the best advantage possible. On the same day the products company confirmed this telegram by letter, stating among other things:

"We trust you will do your very best on this car, and send us remittances as rapidly as possible, because your refusal of this car has set us back considerably, and at a time when, more than any other, we are unable to stand such a blow."

. The railroad company refused to release the shipment as an open shipment until original bill of lading had been actually surrendered to it. This resulted in considerable correspondence between the products company

147 Miss.—4.

and appellee, resulting in the surrender of the original bill of lading to the railroad company. The surrender of the original bill of lading to the railroad company, and the return of the draft by the bank at Greenwood to appellant, came about in this way: Appellant, without the knowledge of appellee, wired the bank at Greenwood to return the bill of lading and draft, which the bank at Greenwood did. On receipt of the draft and bill of lading by appellant at Owensboro, appellant delivered the bill of lading to the products company, retaining the draft, and immediately the products company, through its secretary and treasurer, Robertson, surrendered the bill of lading to the railroad company at Owensboro, and the agent of the railroad company thereupon telegraphed the agent of the railroad company at Greenwood to eliminate the shipper's order clause in the bill of lading, and deliver the car to appellee on open shipment, stating that the railroad company's agent at Owensboro held the original bill of lading. Thereupon the car of feed was delivered by the railroad company to appellee as an open shipment. Upon delivery of this car, appellee unloaded same, and, on June 3d, wrote the products company that the feed was in worse condition than was expected, and requested that the products company give appellee some idea of what it would consider the value of the feed; that in its bad condition it would have to be offered for sale as hog feed, to which the products company replied that it left the matter entirely with appellee; that it would rely upon appellee to get the best price possible; and that the products company would appreciate appellee's beginning, at once, to send remittances to the products company, as it sold the feed, instead of waiting to send remittances for the entire carload. While this correspondence was going on between the products company and appellee, the former was in financial distress. On May 25th the products company sent out a circular letter to its customers informing them of its bankruptcy and inability, therefore, to carry out its con-

tracts. The products company was declared bankrupt, and ceased operations. No dividend was ever paid to its creditors. Neither appellee nor appellant probated their claims against the bankrupt's estate.

On June 14th, after appellee had disposed of the car of feed stuff, it wrote the products company stating what it had been done, and advising that it had applied the net proceeds of the sale of the car of feed stuff, one thousand three hundred thirty dollars and fifty-seven cents, against the damages suffered by appellee on account of the breach by the products company of its contract to ship appellee the remaining eight hundred and seventy tons of feed provided for by the contract. In this letter the appellee inclosed the products company a detailed statement showing the disposition of the car of feed. To this letter the products company made no reply, and the evidence shows that appellee never heard any more of the transaction for nearly two years thereafter, when it received a letter from the attorneys of appellant advising that appellant was claiming of appellee the net proceeds of the sale of the car of feed stuff by virtue of having been the holder of the draft therefor, with bill of lading attached.

The evidence showed further that appellee was a stock feed handler, and knew the custom of shippers of assigning to banks drafts for such shipments with bills of lading attached; that banks, in the ordinary course of trade, advanced money to customers on such drafts; that, in answer to a request from appellee to the products company to have the banks deliver up this bill of lading and draft, the products company replied by telegram that it was unable to get the draft and car of feed released; that the appellee, in a letter to the products company, suggested that the latter arrange with the bank at Greenwood to turn over the bill of lading either to the products company or the railroad company at Greenwood.

But nowhere in the testimony was it shown that appellee knew that appellant had any interest in, or any con-

nection whatever with, the draft and bill of lading. Appellee only knew that the bank at Greenwood held the draft, with bill of lading attached, for collection. It is unquestioned, however, by appellee, that appellant, in good faith, paid the products company value for the draft and bill of lading, nor does the appellee question that, under the federal Bills of Lading Act, appellant would be entitled to recover in this case, except for what followed between appellant and the products company after the car reached Greenwood.

We think the questions involved in this case are solvable by the application of well-defined principles of law governing the rights of a third person dealing with an undisclosed agent, for an undisclosed principal. Where a third person enters into a contract with an undisclosed agent, believing him to be the real principal, the agent assuming to act as principal, and the third person is sued upon the contract by the real principal, he may avail himself of any defense which exists in his favor against the undisclosed agent at the time the principal first demands fulfillment of the contract; and a third person contracting with an undisclosed agent, such undisclosed agent acting in his own name and right, without notice to such third person of his agency, may set off a debt or claim due to him from such agent personally in an action on the contract by the principal. If a sale of goods is made by a person intrusted therewith, and such person sells the goods as his own, in his own name as principal, and the purchaser of the goods deals with the seller in good faith, as principal, and it turns out that the seller of the goods was an undisclosed agent of an undisclosed principal, the purchaser has the right of set-off in an action against him by such undisclosed principal. 2 C. J., pp. 877 and 878; 31 Cyc., p. 1601; *Frazier* v. *Poindexter*, 78 Ark. 241, 95 S. W. 464, 115 Am. St. Rep. 33, 8 Ann. Cas. 552; *Parker* v. *Dantzler Foundry Co.*, 118 Miss. 126, 79 So. 82, L. R. A. 1918F, 795. It was said in the *Parker* v. *Dantzler case, supra,* that it was an essential princi-

ple of law that a party had the right to select with whom he would contract, and could have no person thrust upon him without his consent; that the wisdom of that rule was manifest in that case, where the party sued had a perfect defense by way of set-off against the party with whom he thought he was contracting. *Foreign Trade Corporation* v. *Gerseta Corporation*, decided by the New York Court of Appeals, on December 27, 1923, and reported in 237 N. Y. 265, 142 N. E. 607, 31 A. L. R. 932, is strongly in point both on its facts and law. Therein a bank furnished money to an importer to enable him to buy silks in China, but, in order to enable him to sell the silks in this country, the bank accepted from the importer trust receipts for the silks. After arrival here, the importer delivered to a purchaser a lot of it, and, on the same day, the bank wrote to the purchaser, inclosing in the letter trade acceptances, and with them sending invoices of the importer. The purchaser refused to sign the acceptances. Suit was brought by the bank against the purchaser, who defended on the ground that the importer was indebted to him on another account for an amount in excess of the amount due by him for the silks. The evidence showed that the purchaser had no notice of the bank's right in the silks at the time the silks were delivered to him. The trial court directed a verdict for the bank, and refused to permit the purchaser to go to the jury on the question of whether he knew the title was in the bank, and thereby denied him the right to set-off, against the claim of the banks, his claim against the importer of the silks. The Court of Appeals of New York reversed the case, saying, among other things:

"The bank asserts that the silk was its property under the trust receipts, and that the importer, 'as agent and on behalf of plaintiff under said trust receipts sold and delivered' the same. Under the construction that the bank has placed on the trust receipts, by proceeding by this action to enforce the contract between the importer,

as its agent and the purchaser, the bank takes the position that the importer sold and delivered the silk to the purchaser as its agent. While it may be contended that, as between the importer and the bank, under the terms of the trust receipt, the importer had no authority to sell the silk in its own name, the bank now seeks to recover in affirmance of the sale made by its agent. The rule is elementary that an undisclosed principal cannot assert his rights against a third party without leaving to the third party the same rights that it would possess if the agent had in fact been the principal. If the agent sells goods in his own name, having possession of the goods, the right of set-off which might be asserted against the agent may be asserted against the undisclosed principal. The state of accounts between the agent and the third party at the time the principal seeks to assert his rights against the third party becomes a matter of defense. If the purchaser, acting innocently and in good faith, with no notice or knowledge, sufficient to put it on inquiry, of the agreement between the bank and the importer, dealt with the importer in reliance on its contract to purchase the silk from it and the possession of the goods, the rights of the purchaser are not to be affected by the subsequent disclosure of an unknown principal and the limitations on the authority of the agent. *New York Security & Trust Co., v. Lipman,* 157 N. Y. 551, 52 N. E. 595. Although the bank now contends that it did not sell the silk, because the silk had been already sold by the importer to the purchaser and that, by the terms of the trust receipt, the bank delivered documents of title to the importer solely to enable the importer to obtain possession of the merchandise and deliver it to the purchaser, its complaint is plainly in conflict with this theory of the case. The bank did not vest title in the importer, but it invested it with the *indicia* of title and the possession of the goods. It might have protected itself if it had not put it into the power of the importer to deceive innocent persons. Plaintiff must rest

on the theory that the purchaser was not an innocent party, but that it knew that delivery was made under the trust receipt. . . .

The purchaser's contract was with the importer; the possession of the goods was in the importer, and delivery was made by it. It had rightful possession of the goods and authority to deliver possession. As between it and the purchaser, it made the sale, not as alleged in the complaint, 'as agent and on behalf of plaintiff under said trust receipt,' but as a principal. . . . The purchaser may therefore assume the position of an innocent party dealing with the agent of an undisclosed principal.''

Appellant argues, however, that, conceding the soundness of those principles of law, it was a question for the jury, under the evidence in the case, whether the appellee dealt in good faith with the products company as an undisclosed agent. Appellant insists there was testimony tending to show that appellee knew that the products company was an undisclosed agent, or had notice of facts sufficient to put appellee on inquiry, which, if pursued, would have led to that knowledge.

We are of opinion that appellant is mistaken in that view. It is undisputed in the evidence that the appellee never, at any time, knew that appellant had any interest whatever in the proceeds of the sale of the car of feed. All the correspondence with reference to the converting of the car of feed into an open shipment was had between appellee and the products company. Appellant was unknown in such correspondence. When the shipment was converted into an open shipment, it was agreed between appellee and the products company that the net proceeds of the sale of the feed stuff should be remitted to the products company. Appellee had no knowledge that the proceeds were to be turned over to appellant by the products company. An invoice was sent by the products company to the appellee covering the shipment. There was nothing in this invoice to show that

appellant had any interest in the shipment. The freight bill for the shipment was in evidence, and disclosed only the name of the products company as consignor. There was no reference in it to appellant. The draft with bill of lading attached was returned to Owensboro. It is true they were returned to appellant by the agent of the railroad company at Greenwood, but appellee had no knowledge of that fact. When appellant received the draft and bill of lading, it turned over the bill of lading to the products company, retaining the draft. But appellee was also without knowledge of those facts. It is true appellee must have known, as contended by appellant, that ordinarily such shipments were handled by means of some bank account becoming the purchaser of the draft and bill of lading, but we do not think that fact was sufficient to put appellee on notice and inquiry. Considering the manner in which the draft and bill of lading for this shipment were handled, appellee had every reason to believe that, if they had been purchased by any bank, the products company had prevailed on such bank to cancel the transaction by their return to the products company. The muniment of title to the car of feed was the bill of lading. Through the products company that was surrendered. Appellee knew that, ordinarily, such drafts and bills of lading went together, and had the right to presume that, if one was surrendered, both were surrendered.

We think this is a typical case of a third person dealing, in good faith, with an undisclosed agent, and therefore appellee had the right of set-off against the claim of appellant as fully as it would have had against the products company in a suit by the latter.

The other questions argued on behalf of appellant we do not think of sufficient seriousness to discuss.

We do not think *Lumber Co. v. Andelusia National Bank*, 138 Miss. 566, 103 So. 343, relied on by appellant, is in point.

*Affirmed.*